IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

HELEN GARDNER,                            )
                                          )
                 Plaintiff,               )
                                          )
        v.                                )        No. 05 C 4629
                                          )
ILLINOIS PREFERRED REAL ESTATE,           )
LLC, d/b/a PRUDENTIAL PREFERRED           )
PROPERTIES,                               )
                 Defendant.               )

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiff Helen Gardner brings the present six-count Complaint alleging gender

discrimination and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42

U.S.C. § 2000e *et seq.*, age discrimination and retaliation under the Age Discrimination in

Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*, a violation of the Employment

Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, and a common law tort

claim of battery against her former employer Defendant Illinois Preferred Real Estate LLC, d/b/a

Prudential Preferred Properties ("Prudential").  Before the Court is Prudential's Motion for

Summary Judgment pursuant to Federal Rule of Civil Procedure 56(c).  For the following

reasons, the Court grants in part and denies in part Prudential's motion.

## BACKGROUND

### I.      Parties

Helen Gardner ("Gardner") is female and was born on November 6, 1936.  (R. 28-1,

Def.'s Rule 56.1 Stmt. Facts ¶ 3.)  In 2000, the former CEO for Prudential Illinois, Doug

Yeaman, recruited Gardner to work for Prudential as an office manager at the Winnetka, Illinois

branch. (R. 43-1, Pl.'s Rule 56.1 Stmt. Add'l Facts ¶¶ 1, 3.)[1] In November 2001, Gardner

became the office manager of Prudential's branch office in Highland Park, Illinois and in

December of 2002 she became the office manager of Prudential's office at 1201 North Clark

Street in Chicago. (Def.'s Stmt. Facts ¶ 6.) Before Yeaman recruited Gardner to work in

Illinois, she had worked for Prudential in Connecticut and had 25 years of experience in the real

estate business. (Pl.'s Stmt. Add'l Facts ¶ 2.)

Prudential is a limited liability company organized under the laws of the State of Illinois

and does business at, among other places, 1201 North Clark Street, Chicago, Illinois. (Def.'s

Stmt. Facts ¶ 4.) Prudential is a real estate brokerage company formed in 1999 and currently has

ten branch offices throughout the Chicago area. (*Id.* ¶ 5.)

## II.     Gardner's Job Responsibilities

As office manager, Gardner's duties included recruiting and hiring sales agents, as well

as training and supervising the real estate agents. (*Id.* ¶ 7.) Gardner also ensured the production

and profitability of the office. (*Id.*) While at the Winnetka office, Gardner recruited over 20

sales agents. (Pl.'s Stmt. Add'l Facts ¶ 8.) After Yeaman approached her to help manage the

Highland Park office, Gardner recruited approximately 20-25 sales agents there, as well. (*Id.* ¶¶

9-10.) In early 2003, Yeaman asked Gardner to run the 1201 North Clark Street office based on

her strong recruiting skills and success at the other Chicago area offices. (*Id.* ¶¶ 12, 14.) While

at the 1201 North Clark Street office, Gardner's supervisor gave her excellent feedback and told

her she was getting the place "under control." (*Id.* ¶ 22.)

_____

[1] Because Prudential failed to respond to Plaintiff's Rule 56.1 Statement of Additional Facts, Plaintiff's Statement – in its entirety – is deemed admitted. *Brengettcy v. Horton,* 423 F.3d 674, 681 (7th Cir. 2005).

### III.    Gardner's Supervisors

During the time period from 2000 until January 2004, Yeaman or Ben Gerstman, another former CEO of Prudential Illinois and present member of the Board of Directors, supervised Gardner's work.  (*Id.* ¶ 4.)  On January 12, 2004, a new management team started supervising the Chicago branch office managers, which included Chief Operating Officer David Hanna, President James Roth, and Chief Financial Officer Bill White.  (Def.'s Stmt. Facts ¶ 8.)  This new management team handled the day-to-day operations of Prudential and began to review Prudential's branch offices.  (*Id.* ¶¶ 8, 9, Ex. 5, White Dep., at 121-123.)

### IV.    Gardner's Demotion

On April 5, 2004, Hanna called Gardner into the manager's office at 1201 North Clark Street and demoted her from office manager to recruiter.  (Pl.'s Stmt. Add'l Facts ¶¶ 56, 58; Def.'s Stmt. Facts ¶ 46.)  While Hanna and Gardner were exiting the manager's office, Hanna pulled Gardner's hair back from her face and asked her if she had gotten a face lift.  (Pl.'s Stmt. Facts ¶ 59.)  Shortly thereafter, Gardner complained about her demotion in an email to Hanna, Roth, and White wherein she explained her many successes at Prudential and indicated that she felt that her "obvious maturity played some role" in her demotion.  (*Id.* ¶ 62; Def.'s Stmt. Facts ¶ 47.)  Meanwhile, prior to her demotion, the new management team did not discuss any problems with Gardner concerning her work performance.  (Pl.'s Stmt. Add'l Facts ¶ 55.)

### V.    Gardner's Termination

On or about May 15, 2004, Hanna advised Gardner that Prudential was terminating her employment effective May 30, 2004.  (*Id.* ¶ 72; Def.'s Stmt. Facts ¶ 60.)  Hanna replaced Gardner as office manager of the 1201 North Clark Street branch.  (*Id.* ¶ 61.)  Prudential

contends it terminated Gardner's employment based on her deficient work performance. (*Id.* ¶¶ 58, 59.) In his deposition, however, Hanna admits that part of the reason the management team terminated Gardner's employment was that she was not supportive of the changes the management team was trying to make as evidenced by her emails concerning her demotion, including the email in which she indicated that her "obvious maturity played some role" in management's decision. (*Id.* ¶ 73; Ex. C, Hanna Dep. at 204-07.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P 56(c). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). In determining whether a genuine issue of material fact exists, the Court construes the facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of that party. *Anderson v. Liberty Lobby*, Inc., 477 U.S. at 255. "[W]hen a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 250 (quoting Fed R. Civ. P. 56(e)); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

**<u>ANALYSIS</u>**

**I.      ADEA and Title VII Discrimination Claims**

Gardner alleges that Prudential discriminated against her based on her gender and age.

Under the ADEA and Title VII, Gardner may prove intentional discrimination using either the

direct or indirect method of proof as set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S.

792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).  *See Jordan v. City of Gary, Ind.,* 396 F.3d 825,

833 (7ᵗʰ Cir. 2005) (the *McDonnell Douglas* framework "is applicable whether the discrimination

alleged is on the basis of sex, when proceeding pursuant to Title VII, or on the basis of age,

under the ADEA.").  Gardner proceeds under the indirect method of proof, and thus must

establish a prima facie case of intentional discrimination by showing that:  (1) she is a member of

a protected class; (2) she reasonably performed to Prudential's legitimate job expectations; (3)

Prudential took an adverse employment action against her; and (4) Prudential treated her

differently than similarly situated employees outside of her protected classes.  *See McDonnell*

*Douglas*, 411 U.S. at 802.  If Gardner makes this showing, the burden of production shifts to

Prudential to articulate a legitimate, nondiscriminatory reason for its actions.  *See id.*  If

Prudential meets this burden, Gardner must then show that Prudential's proffered explanation is

pretext for discrimination.  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.

Ct. 1089, 1095, 67 L.Ed.2d 207 (1981).  The ultimate burden of persuasion, however, remains

with Gardner at all times.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 517-18, 113 S. Ct.

2742, 2752-53, 125 L.Ed.2d 407 (1993); *Raymond v. Ameritech Corp.*, 442 F.3d 600, 610 (7ᵗʰ

Cir. 2006).

**A.      Prima Facie Case**

5

Prudential does not dispute that Gardner is a member of a protected class under Title VII

and the ADEA and that it took adverse employment actions against Gardner, namely, that it

terminated Gardner's employment after demoting her from office manager to recruiter. Instead,

Prudential maintains that Gardner was not meeting its legitimate job expectations and that it did

not treat her less favorably than similarly situated employees outside of her protected classes.

The Court addresses each argument in turn.

### 1. Legitimate Job Expectations

First, Prudential contends that Gardner did not meet its legitimate job expectations

because she did not have a broker's license.[2] Whether Prudential required Gardner to obtain a

broker's license, however, is factually disputed. Specifically, in Gardner's additional statement

of facts to which Prudential did not respond, evidence reveals that Prudential did not require its

branch managers to obtain broker's licenses. (Pl.'s Stmt. Add'l Facts ¶¶ 49, 50, 51; Ex. B,

Gerstman Dep. at 64-65.) Therefore, Gardner has presented definite, competent evidence to

rebut Prudential's contention. *See Butts v. Aurora Health Care, Inc.,* 387 F.3d 921, 924 (7th Cir.

2004).

Next, Prudential argues that Gardner "had never shown a profit in any office she had ever

managed." (R. 27-1, Def.'s Mem. Support Summ. J., at 6.) Gardner refutes Prudential's

contention by setting forth evidence that the financial information Prudential relies upon is

---

[2] Prudential contends that whether Gardner was qualified for her job is a separate prima
facie element of her claims based her demotion and termination. (R. 27-1, Def.'s Mem. Support
Summ. J., at 8.) Prudential's argument is misplaced because a plaintiff's job qualifications are
relevant when the adverse employment action is a failure to promote or failure to hire. *See
Sublett v. John Wiley & Sons, Inc.,* 463 F.3d 731, 736-37 (7th Cir. 2006); *Rudin v. Lincoln Land
Cmty. Coll.,* 420 F.3d 712, 724 (7th Cir. 2005). The Court thus addresses this argument within
the context of the legitimate job expectations prima facie element.

inaccurate and that it generally takes two years to turn a real estate office around to make it productive. (Pl.'s Stmt. Add'l Facts ¶¶ 35, 36.) Furthermore, Gardner presents evidence that when she first started managing the 1201 North Clark Street branch, it was losing about $30,000 a month and that she started to turn it around in a matter of months. (*Id.* ¶ 26.) In fact, in April of 2004, Prudential issued a company wide email giving special recognition to 1201 North Clark Street branch for "an incredible first quarter" indicating sales were up over the prior year. (*Id.* ¶ 35.) Accordingly, there is a genuine issue of material fact as to whether Prudential's assertions are true.

Furthermore, Prudential contends that "Gardner's sales agent recruiting and retention numbers were abysmal." (Def.'s Mem. Support Summ. J., at 6.) Again, Gardner has set forth evidence that while she managed the Winnetka and Highland Park branch offices she recruited at least 20 sales agents at each location. (Pl.'s Stmt. Add'l Facts ¶¶ 8, 9, 10.) In fact, Gardner presents undisputed evidence that Hanna called her before the new management team took over and asked her to return to Highland Park to manage the office because she had recruited the majority of the agents in that office and that they all really liked her. (*Id.* ¶ 52.) Further, in early 2003, the former CEO for Prudential Illinois asked Gardner to run the 1201 North Clark Street office based on her strong recruiting skills and success at the other Chicago area offices. (*Id.* ¶¶ 12, 14.) Meanwhile, Prudential's claim that approximately 65 sales agents left the 1201 North Clark Street office while Gardner was manager is rebutted by the fact that Hanna and Roth hired many of these agents out from under Gardner to work at the Lakeview branch office. (*Id.* ¶¶ 16, 17, 18.) Gardner also presents evidence that she had to terminate a number of the non-productive agents at the 1201 Clark Street office upon her arrival to fix pre-existing problems.

(*Id.* ¶¶ 13, 20, 21.) Accordingly, Gardner has presented evidence creating a genuine issue of material fact as to this argument.

Prudential further contends that Gardner was not competent in ensuring that the office files, agent paperwork, and real estate transaction documents were in compliance with company and state regulations. Gardner rebuts Prudential's assertion with evidence that it was her assistant manager at the 1201 North Clark Street branch office who was in charge of ensuring compliance for the paperwork and the files. (*Id.* ¶ 37.) Further, Gardner sets forth evidence that the administrative manager and the compliance officer supervised the assistant manager's job responsibilities concerning compliance. (*Id.* ¶ 38.)

Moreover, Prudential explains that Gardner did not meet its legitimate job expectations because she did not have the ability to manage her office, including the supervision of her employees and sales agents. Again, Gardner refutes Prudential's argument with evidence that she was a capable branch manager at the 1201 North Clark Street office (as well as the Highland Park and Winnetka offices) and that she ensured that her agents were focused, helped set goals for her employees, attempted to create a fair environment, and conducted training. (*Id.* ¶¶ 41-45.) Gardner also sets forth evidence that morale at her offices was "usually upbeat." (*Id.* ¶ 48, Ex. B, Gerstman Dep., at 120.). Finally, Gardner refutes Prudential's assertion that it had concerns about the sick time she took after her March of 2004 vacation. (*Id.* ¶ 25.)

Accordingly, Gardner has "set forth specific facts showing that there is a genuine issue for trial" concerning Prudential's legitimate job expectations under the second element of her prima facie case of age and gender discrimination. *See Anderson v. Liberty Lobby*, Inc., 477 U.S. at 250; *see also Butts*, 387 F.3d at 924.

### 2. Similarly Situated Employees

Next, Prudential argues that Gardner has failed to set forth evidence in support of the fourth prima facie element of discrimination, namely, whether Prudential treated similarly situated employees outside of Gardner's protected classes more favorably than she. To establish that another employee is similarly situated, Gardner must show that there is someone who is directly comparable to her in all material respects. *Bio v. Federal Express Corp.,* 424 F.3d 593, 597 (7th Cir. 2005) (citing *Patterson v. Avery Dennison Corp.,* 281 F.3d 676, 680 (7th Cir. 2002)). "Factors courts consider in determining whether two employees are similarly situated include whether the employees shared the same supervisor, whether they were subject to the same standards and whether they had engaged in similar conduct." *Franklin v. City of Evanston*, 384 F.3d 838, 847 (7th Cir. 2004) (internal quotation omitted).

Here, unrebutted evidence in the record indicates that Hanna, Roth, and White only terminated female managers during that relevant time period and that those women were all replaced by men. (Pl.'s Stmt. Add'l Facts. ¶¶ 67, 68.) For instance, Gardner has set forth evidence that her direct replacement, Hanna, was much younger than she and a man. (*Id.* ¶ 66.) Gardner also presents evidence that at the time of her demotion and termination she was one of the oldest employees at Prudential. (*Id.* ¶ 65.) Further, it is undisputed that the office managers were all subject to the same standards in running their branches. (Def.'s Stmt. Facts ¶ 11.) In addition, Hanna, Roth, and White were the supervisors for all of the office managers at the Chicago branches. (*Id.* ¶¶ 8, 9.) In fact, this new management team "shared all major decisions regarding the operation of the company." (*Id.* ¶ 8.) Finally, there is evidence in the record that, like Gardner, other office managers engaged in similar conduct in running their branches. (Pl.'s

9

Stmt. Facts ¶¶ 24, 35.)

Thus, viewing the evidence and all reasonable inferences in a light most favorable to Gardner, she has set forth evidence creating a genuine issue of material fact concerning the fourth prima facie element as to her gender and age discrimination claims. *See Paul v. Theda Med. Ctr., Inc.,* 465 F.3d 790, 793-94 (7th Cir. 2006) ("court must draw every justifiable inference from the record in the light most favorable to the nonmoving party").

**B.      Legitimate, Non-Discriminatory Reasons for Employment Decision**

Because Gardner has set forth evidence of a prima facie case of gender and age discrimination, the burden shifts to Prudential to articulate a legitimate, nondiscriminatory reason for demoting Gardner and consequently terminating her employment. As Prudential correctly asserts, this factor is closely tied to the second element of the prima facie case of gender and age discrimination, namely, whether Gardner was meeting Prudential's legitimate job expectations. (R. 27-1, Def.'s Mem. Support Mot. Summ. J., at 9.) Indeed, Prudential relies on the same arguments as discussed above, including Gardner's failure to get a broker's license, to support its contention that it had legitimate, non-discriminatory reasons for "removing" Gardner as an office manager and discharging her from the company.

Because Gardner has set forth evidence creating a genuine issue of material fact as to Prudential's proffered reasons, Prudential has failed in its burden of establishing that there are no genuine issues of material fact for trial regarding Gardner's discrimination claims under Title VII and the ADEA. Thus, the burden does not shift back to Gardner to establish that Prudential's explanations are mere pretext for discrimination. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. at 256. Therefore, the Court denies Prudential's summary judgment motion

10

regarding Gardner's ADEA and Title VII intentional discrimination claims.

**II.      ADEA &Title VII Retaliation Claims**

Prudential also moves for summary judgment as to Gardner's retaliation claims.  "An

employer may not retaliate against an employee who has complained about discrimination or

other employment practices that violate Title VII or the ADEA."  *Racicot v. Wal-Mart Stores,*

*Inc.,* 414 F.3d 675, 678 (7ᵗʰ Cir. 2005).  "Retaliation occurs when an employer takes an adverse

employment action against an employee for opposing impermissible discrimination."  *Durkin v.*

*City of Chicago*, 341 F.3d 606, 614 (7ᵗʰ Cir. 2003).  A plaintiff may pursue her retaliation claims

under either the direct or indirect method of proof.  *Burks v. Wisonsin Dep't of Transp.,* 464 F.3d

744, 758 (7ᵗʰ Cir. 2006); *Stone v. City of Indianapolis Pub. Utils. Div.,* 281 F.3d 640, 644 (7ᵗʰ

Cir. 2002).

**A.      ADEA Retaliation Claim**

Gardner attempts to establish her age retaliation claim under the direct method of proof.

Under this method, Gardner must present evidence of (1) a statutorily protected activity, (2) an

adverse employment action, and (3) a causal connection between the two.  *Burks,* 464 F.3d at

758.  "[C]ircumstantial evidence that is relevant and probative on any of the elements of a direct

case of retaliation may be admitted and, if proven to the satisfaction of the trier of fact, support a

case of retaliation."  *Treadwell v. Office of the Ill. Sec'y of State,* 455 F.3d 778, 781 (7ᵗʰ Cir.

2006) (citing *Sylvester v. SOS Children's Villages of Ill., Inc.,* 453 F.3d 900, 902-03 (7ᵗʰ Cir.

2006)).

Here, Gardner has presented evidence of the first two prongs under the direct method –

Gardner's email to Hanna in which she complained that her demotion was age-related is a

protected activity and her termination is unequivocally an adverse employment action. *Burks*, 464 F.3d at 758 (complaint about age discrimination to supervisor is protected activity). Specifically, Gardner's April 12, 2004 email to Hanna – that was copied to both White and Roth – states in relevant part:

> I can find no logic to this decision. Not once have I been provided any feedback to suggest that I had deficiencies in my performance or my management style that needed to be corrected. I can only conclude that this decision is obviously not performance related. I am searching to find a reason and all I can suppose is that my obvious maturity played a some role. I recall that same Monday when you pulled the hair back from my forehead and asked if I had had a facelift. At that time, I was too surprised at this personal and intrusive comment to respond, but it caused me to wonder if this really is the reason.

(Def.'s Stmt. Facts ¶ 47, Ex. 12, Gardner April 12, 2004, email to D. Hanna.)

Because Gardner has set forth evidence concerning the first two elements of direct proof in support of her retaliation claim based on her age, the Court turns to whether Gardner has presented evidence reflecting a causal link between her email in which she complained of age discrimination and her termination. Here, Gardner sets forth Hanna's deposition testimony in which he admits that part of the reason the management team terminated Gardner's employment was that she was not supportive of the changes the management team was trying to make as evidenced by her emails concerning her demotion, including the email in which she challenged her demotion and indicated that her "obvious maturity played some role" in management's decision. (*Id*. ¶ 73; Ex. C, Hanna Dep. at 204-07.) Thus, viewing the evidence and all reasonable inferences in a light most favorable to Gardner, there are genuine issues of material fact regarding her ADEA retaliation claim.

## B.      Title VII Retaliation Claim

Next, Gardner attempts to establish her Title VII retaliation claim under the indirect

12

method of proof.  Under the indirect method, Gardner must establish a prima facie case of

retaliation by offering evidence of the following:  (1) she engaged in protected activity; (2) she

suffered an adverse employment action; (3) she met Prudential's legitimate job expectations; and

(4) she was treated less favorably than similarly situated employees who did not engage in

statutorily protected activity.  *Burks,* 464 F.3d at 759 (*citing Stone,* 281 F.3d at 644).

Here, Gardner has failed to present any evidence that she engaged in protected activity

based on her gender.  For instance, her emails to the Prudential management team after her

demotion do not indicate that she complained about gender discrimination to any supervisor.

Moreover, Gardner's argument that Hanna's comment about a facelift concerns an inherently

female issue requires an inferential leap the Court will not take.  *See East-Miller v. Lake Cty.*

*Highway Dep't,* 421 F.3d 558, 564 (7th Cir. 2005).  Because Gardner has failed to present

evidence supporting the first element under the indirect method of proof, the Court grants

Prudential's summary judgment motion regarding Gardner's gender retaliation claim brought

under Title VII and dismisses Count V of the Complaint.

## III.    ERISA Claim

Next, Gardner claims that Prudential violated Section 510 of ERISA by terminating her

employment resulting in the loss of her benefits under the Prudential's welfare, pension, and

health benefit plans.  *See* 29 U.S.C. § 1140.  "By its terms § 510 protects plan participants from

termination motivated by an employer's desire to prevent a pension from vesting."  *Ingersoll*

*Rand Co. v. McClendon,* 498 U.S. 133, 143, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990).  "The loss

of benefits to an employee as a result of an employer's action is not, by itself, sufficient to prove

a violation of § 510," instead, the "employer must have the specific intent to deprive an

13

employee of his plan rights." *Isbell v. Allstate Ins. Co.,* 418 F.3d 788, 796 (7th Cir. 2005).

Accordingly, Gardner may recover under Section 510 if she can establish that Prudential

terminated her employment with the specific intent to interfere with her ERISA benefits. *Id.*

(citing *Lindemann v. Mobil Oil Corp.*, 141 F.3d 290, 295 (7th Cir. 1998)). Put another way,

Gardner "must ultimately show that a desire to frustrate attainment or enjoyment of benefit rights

contributed toward the employer's decision." *Isbell*, 418 F.3d at 796 (quoting *Teumer v.*

*General Motors Corp.*, 34 F.3d 542, 550 (7th Cir. 1994)).

Here, Gardner does not set forth any evidence creating a genuine issue of material fact

that when terminating her employment, Prudential had the specific intent to interfere with her

ERISA benefits. Meanwhile, it is undisputed that Prudential's insurance premiums and costs

were the same for Gardner as they were for the other employees despite Gardner's belief that her

benefits played a role in her termination based on the cost of health care for older individuals.

(Def.'s Stmt. Facts ¶ 62.) Gardner's belief that Prudential had the intent to interfere does not

save the day because she must "show that a desire to frustrate attainment or enjoyment of benefit

rights contributed toward the employer's decision and can avoid summary judgment only if the

materials properly before the district court, construed sympathetically, allow for such a

conclusion." *Isabell,* 418 F.3d at 796. Viewing the evidence in a light most favorable to

Gardner, there are no genuine issues of material fact concerning her ERISA claim, and thus the

Court grants Prudential's summary judgment motion as to this claim. The Court thereby

dismisses Count III of Gardner's Complaint.

## IV. Common Law Tort Claim – Battery

In Count VI of her Complaint, Gardner alleges a battery claim based on Hanna touching

her face, pulling her hair back, and asking her if she had gotten a face lift.  To recap, Gardner

articulated in her email to Hanna that:  "I recall that same Monday when you pulled the hair back

from my forehead and asked if I had had a facelift.  At that time, I was too surprised at this

personal and intrusive comment to respond, but it caused me to wonder if this really is the

reason."  (Def.'s Stmt. Facts ¶ 47, Ex. 12, Gardner April 12, 2004, email to D. Hanna.)

Under Illinois law, a person commits the tort of battery if (1) he acts intending to cause a

harmful or offensive contact or an imminent apprehension of such a contact, and (2) harmful

contact directly or indirectly results.  *Cohen v. Smith*, 269 Ill.App.3d 1087, 1090, 207 Ill.Dec.

873, 648 N.E.2d 329, 332 (1995) (citing Restatement (Second) of Torts, § 13 (1965)); *see also In

re Estate of Allen,* 365 Ill.App.3d 378, 302 Ill.Dec. 202, 848 N.E.2d 202, 210 (2006)

("common-law battery is the unauthorized touching of the person of another").  "[T]he defendant

is liable not only for contacts which do actual physical harm, but also for those relatively trivial

ones which are merely offensive and insulting."  *Cohen,* 169 Ill.App.3d at 1091 (citation

omitted).

Prudential first argues that Hanna's touching was not a battery because it was merely

"innocuous."  In support of its argument, Prudential relies on a federal district court case from

the Eastern District of New York interpreting New York state law.  *See Lucas v. South Nassau

Cmty. Hosp.*, 54 F.Supp.2d 141, 151 (E.D.N.Y. 1998).  This case is not controlling Illinois

authority, and even if it were controlling, it is not persuasive.  Specifically, the *Lucas* court

concluded that the touching at issue was innocuous because "the plaintiff and defendant were

large individuals who worked in a supply department with narrow aisles."  *Id.* at 151.  The *Lucas*

court also concluded that the contact occurred in the "normal workaday environment."  *Id.*  Here,

15

Gardner sets forth evidence that Hanna's touching was not innocuous, but that it was intrusive. (Pl.'s Stmt. Add'l Facts ¶¶ 59, 60, 61.) Further, there is no evidence in the record that such personal touching occurred as part of the "normal workaday environment" at Prudential. Thus, Prudential's argument based on the *Lucas* opinion is without merit.

Nevertheless, Prudential contends that Gardner has failed to set forth evidence that Hanna had the intent to harm her when he touched her. *See Glowacki v. Moldtronics, Inc*., 264 Ill.App.3d 19, 22, 201 Ill.Dec. 706, 636 N.E.2d 1138, 1140 (1994) ("Where the party inflicting the injury is not doing an unlawful act, the intent to harm is material."); *see also Cohen,* 269 Ill.App.3d at 1090 (plaintiff must show defendant intended to cause harmful or offensive contact). Indeed, although Gardner thought Hanna's touching – along with his comment – was personal and intrusive, there is no evidence in the record indicating that Hanna intended to cause harmful or offensive contact. Viewing the evidence and all reasonable inferences in a light most favorable to Gardner, the Court grants Prudential's summary judgment motion regarding Gardner's common law battery claim because she has failed to set forth evidence supporting Hanna's intent. *See Celotex Corp. v. Catrett,* 477 U.S. at 322-23 (plaintiff must come forward with credible evidence on all matters upon which she bears burden of proof at trial.) Thus, the Court dismisses Count VI of the Complaint.

## CONCLUSION

Based on these reasons, the Court grants in part and denies in part Defendant's Motion

for Summary Judgment. Specifically, the Court grants Defendant's Motion for Summary

Judgment regarding Plaintiff's Title VII retaliation claim, ERISA claim, and common law

battery claim, but denies the remainder of the Defendant's summary judgment motion. Further,

the Court denies Plaintiff's Motion to Strike the White and Hanna Affidavits as moot. Finally,

the Court denies Plaintiff's Motion to Bar Additional Briefing as moot.

**Dated:** December 4, 2006

                                             **ENTERED**

                                            _____

                                            **AMY J. ST. EVE**
                                            **United States District Court Judge**